**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KAREN YAPP, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:02cv615 SNL** |
| | ) | |
| **UNION PACIFIC RAILROAD** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on plaintiffs' Motion for Class Certification (#41). Plaintiffs filed the instant suit on April 29, 2002, against Union Pacific Railroad Company ("UPRR"), and subsequently filed their Amended Complaint on June 4, 2002. The Amended Complaint in this case alleges, on behalf of six plaintiffs, a wide variety of types of racial discrimination by UPRR in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 *et seq.*, and the Missouri Human Rights Act. Plaintiffs brought this putative class action seeking, *inter alia*, declaratory and injunctive relief for alleged systemic racial discrimination in UPRR's employee selection, training and compensation policies, practices and procedures.

On August 29, 2003, only four of the six plaintiffs, two current UPRR employees, Karen Yapp ("Yapp") and Cynthia Byas ("Byas"), and two former UPRR employees, Mollie Jones ("Jones") and Rodney Grady ("Grady"), filed the instant motion seeking certification of a class made up of all African-Americans, who, from July 18, 2000, to the present, have been adversely impacted by one or more aspects of the Defendant's policies, practices and procedures related to

selections for non-agreement[1] job vacancies.[2]  Plaintiffs' instant motion is supported by the expert report of statistician Dr. Edwin Bradley.  On October 8, 2003, UPRR filed its Memorandum in Opposition to the instant motion, relying on the expert report of Dr. Michael P. Ward and Mr. Nathan D. Woods ("Ward and Woods Report").  On November 6, 2003, plaintiffs filed their Reply.

On September 15, 2003, the plaintiffs filed a motion to strike defendant's experts Dr. Michael P. Ward and Mr. Nathan D. Woods and their report.  On October 7, 2003, UPRR responded in opposition to the motion to strike its experts.  On November 17, 2003, plaintiffs filed their reply to the motion to strike the Ward and Woods Report, and on February 4, 2004, this Court granted the plaintiffs' motion to strike which rendered the report and testimony of defendant's experts inadmissible under FED. R. EVID. 702.  In short, this Court determined that the survey methodology in the Ward and Woods Report was flawed and therefore not admissible scientific evidence.  Subsequently, UPRR filed a motion for reconsideration, or in the alternative a motion for leave to file a revised expert report, which this Court denied.[3]

On February 6, 2004, UPRR filed its Motion for an Evidentiary Hearing with respect to plaintiffs' pending motion for class certification.  On March 10, 2004, this Court issued an order

---

[1]Non-agreement employees are those who are not party to a collective bargaining agreement and who are salaried.  Agreement employees are subject to a collective bargaining agreement.

[2]Therefore, when this Court subsequently refers to "plaintiffs" in the instant order, it is referring only to the four plaintiffs who bring the instant motion, Yapp, Grady, Jones and Byas; and not to the other two named plaintiffs in the Amended Complaint, Erma Jean Wright, and Angela Campbell.

[3]This Court prematurely denied UPRR's motion for reconsideration, or in the alternative for leave to file a revised expert report, without considering UPRR's reply to the motion. Therefore, on April 2, 2004, this Court vacated its earlier ruling of denial, and ultimately denied the motion for reconsideration after considering UPRR's reply.

setting a hearing for July 12, 2004, which was later rescheduled to November 15, 2004.  The

hearing began on November 15, 2004, and concluded on November 17, 2004.  On the final day of

the hearing, the parties were instructed to file post-trial briefs by January 21, 2005.  However, the

parties submitted a joint motion for extension of time to file their simultaneous post-hearing briefs

by February 28, 2005, which was granted by this Court.  On February 22, 2005, plaintiffs filed a

motion to extend the post-trial briefing deadline again, which was granted by this Court with a

final post-trial briefing filing deadline of March 28, 2005.  This matter is thoroughly briefed,[4] and

is now properly before the Court.

Many exhibits, portions of depositions, counter-designations and affidavits, offered by all

parties, were received at the motion hearing without objection.  Some were objected to and the

Court overrules the objections and receives that evidence.  Some depositions and exhibits were

withdrawn by the parties.  Most objections were make because of relevancy.  In review of all the

evidence, it has appeared portions are, in fact, not relevant.  The Court has treated that evidence

with little or no attention.

## Background

UPRR, headquartered in Omaha, Nebraska, is a subsidiary corporation of Union Pacific

Corporation.  UPRR employs two types of employees, agreement and non-agreement.  Although,

UPRR employs approximately 48,000 individuals, 87% of those individuals, or approximately

41,760, are agreement employees.  That system covers 23 states in the Midwest, South, and West

and approximately 33,000 miles of railroad trackage.

---

[4]In fact, this Court has at least five boxes of supporting documents which were submitted
in connection with the instant motion.  Such voluminous filings do not assist the Court in
expeditiously resolving the instant dispute.

The plaintiffs' request for class certification is not based on any allegation that UPRR has a corporate policy of discrimination. To the contrary, the evidence was undisputed that for many years UPRR's corporate policy has prohibited all forms of discrimination, including race discrimination, and that African-American employees are represented in high level executive positions within the company. In fact, the plaintiffs bring this case alleging that they have suffered disparate impact, not disparate treatment, and that accordingly the railroad is responsible for the ultimate results.

*I. Class Representation of the Entire Union Pacific Railroad System Encompassing over Twenty Different Departments*

The plaintiffs seek to obtain class certification to represent African-American employees who have sought non-agreement positions *anywhere* in the Union Pacific Railroad System. As such, an understanding of UPRR's internal organizational structure is necessary in regard to the instant motion in order to understand the scope of the class that the four named plaintiffs seek to represent. Without looking at the scope of the class that the four named plaintiffs seek to represent, it would be impossible to conclude whether the representation would be appropriate under Rule 23 of the Federal Rules of Civil Procedure. *See*, FED. R. CIV. P. 23(a).

During the time period from July 18, 2000, until the fall of 2002, there were over twenty different departments at UPRR (due to some reorganizations, the exact number of departments depends on how the structural change is counted). These departments have distinct and highly diverse functions and non-agreement jobs. The UPRR departments were described at the hearing by William Behrendt ("Behrendt"), Assistant Vice President for Human Resource Customer Services & Sourcing, and in a number of affidavits by UPRR managers which were submitted by UPRR in its opposition to the motion for class certification, and offered into evidence as exhibits by the plaintiffs.

- 4 -

*A. The Four Regional Transportation Departments*

The transportation function at UPRR, the actual movement of trains and freight, as well as certain aspects of the ongoing maintenance of the tracks, locomotives, and railroad cars, is managed by four Regions--Northern, Southern, Central, and Western--each of which functions as a separate department managed by a Regional Vice President. Each region is further subdivided into several smaller "Service Units." The facilities on the transportation Regions are often widely dispersed geographically with relatively few employees at remote locations. An example of a common non-agreement job in the Transportation Region is Manager of Yard Operations, which is a first line supervisory position responsible for employees and train movements within a yard or terminal. Another example is Manager of Operating Practices, which requires a person to be responsible for supervising the locomotive engineers who operate the trains.

*B. The Mechanical Department*

The Mechanical Department is responsible for the repair and maintenance of over 7,000 locomotives and about 100,000 freight cars, in mechanical facilities throughout the UPRR 23-state system. A typical non-agreement job in the Mechanical Department is a Manager of Locomotive Maintenance, which requires supervision of the electricians and diesel mechanics who repair locomotives.

*C. The Harriman Dispatch Center Department*

The Harriman Dispatch Center is a Department responsible for coordinating the movement of trains throughout the UPRR system. Its function is analogous to that of air traffic control systems in the airline industry, and its basic responsibility is routing the trains safely to ensure that there are no collisions. The primary entry level non-agreement position in this department is Apprentice Train Dispatcher/Train Dispatcher. Until 2003, the Harriman Dispatch

Center also had responsibility for the Crew Management Services, which calls the train crews, and the Timekeeping group, which handles timekeeping and payroll for the agreement employees.

### D. The Engineering Department

The Engineering Department is responsible for building and repairing the 33,000 miles of tracks, bridges, and signals on the UPRR system. An example of a common non-agreement job in this department is Manager of Track Programs. The people who work in this position have the first-line supervisory responsibility for maintaining the railroad tracks and ties.

### E. The Premium Operations Department

The Premium Operations Department's primary function is the movement of "intermodal" freight between trains and ships and trucks, which is usually in containers. A common entry level job in this department is Manager of Intermodal Operations, which is a position whereby the individual is responsible for supervising individuals who transfer the freight containers in a terminal.

### F. The Safety and Environmental Practices Department

The Safety and Environmental Practices Department is responsible for several safety-related functions, the largest of which is providing police services. Union Pacific has its own police department throughout the UPRR system, with licensed police officers who carry firearms and have arrest authority. This department also includes employees with environmental and health responsibilities.

### G. The Operating Department and its Four Sub-Departments

Coal Operations, Operating Practices, Quality & Process Improvement, and Support Services are small departments with specialized functions within the larger Operating Department. The Operating Department is an umbrella group that includes a number of separate departments

whose functions relate to the movement of trains and the delivery of freight. The head of the Operating Department is the Executive Vice President-Operations, and the heads of all the aforementioned departments report to him. The Coal Operations Department oversees the movement of coal trains from Wyoming and northern Nebraska. The Operating Practices Department (which merged into the Safety Department in 2003) was responsible for rules enforcement and derailment prevention. The Quality & Process Improvement Department develops and implements training and leadership development programs intended to improve quality. The Support Services Department provides administrative services such as budget support, file maintenance, and mail rooms.

### H. The Supply Department

The Supply Department purchases and warehouses equipment and supplies (such as locomotive parts and railroad ties) and provides these materials to the various other departments as needed. An example of a non-agreement position in the Supply Department is Manager Purchasing.

### I. The Labor Relations Department

The Labor Relations Department is responsible for negotiating and administering the railroad's collective bargaining agreements with the unions that represent its employees.

### J. The Information Technologies Department

The Information Technologies Department is responsible for all of the company's computer activities, including design and development, data center operations, and telecommunications. Plaintiffs Yapp, Jones and Grady all worked in the Information Technologies Department, and considerable testimony was offered during the hearing concerning

several non-agreement positions in the Information Technologies Department, including Project Engineer and Information Analyst.

*K. The Finance Department*

The Finance Department is responsible for finance and accounting functions. An example of a non-agreement position in this department is Senior Manager Customer Accounting.

*L. The Marketing & Sales Department*

The Marketing & Sales Department is responsible for the acquisition of new business and the maintenance of repeat business from existing railroad customers. It includes employees who telemarket UPRR's services. Account Representative is the typical entry level job in the Marketing & Sales Department.

*M. The National Customer Service Center*

The National Customer Service Center ("NCSC") is the provider of customer service for the entire railroad. The NCSC provides shipping information to customers, and communicates with current customers about freight shipment orders and about shipment tracking. The NCSC also handles any shipment problems that occur; transmits orders from customers to the train crews, handles internet orders, and is responsible for scales inspection. The car management function, which manages the routing of empty boxcars around the railroad, was recently transferred to the NCSC. In fact, the customer service function was located in Saint Louis, Missouri until August 2004, when it was transferred to Omaha, Nebraska. As a organizational matter, the NCSC is part of the Marketing & Sales Department, but it functions independently as a separate department.

*N. The Human Resources Department*

The Human Resources ("HR") Department is responsible for administering compensation and benefits, training, equal employment opportunity (EEO), diversity, agreement (union) hiring, and HR "customer services." HR customer services consists of HR "generalists" who are assigned to the other departments at the railroad to assist them with HR-related processes.

*O. The Corporate Relations Department*

The Corporate Relations Department is responsible for governmental affairs, advertising, and the internal corporate television network.

*P. The Law Department*

The Law Department is responsible for the legal services required by the company. The Law Department also has a Risk Management function, which is responsible for handling personal injury claims. Among the non-agreement positions in the Law Department are Attorney, Litigation Assistant, and Claims Representative.

*Q. The Strategic Planning Department*

The Strategic Planning Department assesses such planning matters as possible mergers, acquisitions, and potential interactions with other railroads.

*R. The Network Design and Integration Department*

The Network Design & Integration Department is a small specialized department that plans for future equipment needs and transportation planning.

*S. The Executive Department*

The Executive Department contains the top-level management of the company, including the Chief Executive Officer, the President, and those department heads who report directly to the President. It also encompasses certain administrative services, and includes the pilots and the mechanics for the corporate jets.

All of the aforementioned and above described departments at UPRR employ individuals with distinct functions that are diverse in nature.  These individuals provide services ranging from the actual movement of trains and freight (the four Transportation Regions), to police services (Safety Department), to construction and maintenance of the railroad tracks and bridges (Engineering Department), to the routing of the trains (Harriman Dispatch Center), to computer and data support (Information Technologies Department), to customer services (NCSC), to the maintenance of the locomotive engines and railroad cars (Mechanical Department), to legal advice and defense (Law Department), and to sales and telemarketing (Marketing & Sales Department).  Simply put, UPRR non-agreement employees have different qualifications and skills depending on the department in which they work.

*II. Selection Process for Filling Non-Agreement Vacancies*

The Rule 23 hearing revealed that the parties do not have many disputes regarding the factual nature of the hiring or selection process.  Rather, the parties basically dispute how the factual nature of the hiring or selection process impacts the legal conclusions regarding class certification.  The evidentiary trial revealed that there are some standard or common elements throughout UPRR regarding the selection process, and that there are some elements of the selection process that are not standard across the departments at UPRR.  In regard to the non-standard job selection processes at UPRR utilized in the various departments, the decision making authority is left in the autonomous discretion of certain individuals within the various departments.

*A. Common Elements throughout UPRR regarding the Selection Process*

Certain aspects of the non-agreement selection processes at UPRR are standardized throughout the company, and this includes: (1) the EEOC Policy, (2) the CNET job posting requirement, and (3) Presidential approval to fill positions.

Pursuant to the EEOC Policy, all departments must comply with UPRR's corporate policy prohibiting discrimination. For example, if the Human Resources Department, which is responsible for investigation of alleged violations of the EEO policy, learned of such discrimination, it would elevate the issue to the President of the Railroad if necessary in order to enforce the policy.

The CNET Job Posting Requirement is a fairly standard procedure throughout the company. All vacancies below the executive level must be posted on the company's computerized CNET job posting system, and the results of the selection process must be reported through the computerized CNET system. Certain types of promotions and transfers are excepted from CNET, however, and the Information Technologies Department frequently makes "career path" promotions that are not posted on CNET.

Until recently, (as a budget control measure) the President of UPRR had to personally authorize the filling of any vacancy in a non-agreement position. This approval was given at the beginning of the selection process, before any candidate selections or screening occurred.

There is no evidence that any of the aforementioned three standardized procedures of the non-agreement selection process at UPRR had any adverse effect on African-American candidates for promotion. None of the four individual named plaintiffs asserts that the EEO Policy, the CNET posting requirement, or the requirement of presidential approval of the filling of vacancies had harmed them individually in any way. Moreover plaintiffs' expert, Dr. Bradley, testified that he has not evaluated whether the CNET posting system itself has had any adverse racial impact.

*B. Varying Elements throughout UPRR regarding the Selection Process*

Other than the aforementioned standardized features regarding the hiring and selection process at UPRR, the evidence shows overwhelmingly that decision making at UPRR with respect to non-agreement selections is fully decentralized by department, with entirely different decision makers in each department. Each department is wholly independent with respect to:

(a) the qualifications and requirements it utilizes for such selections,

(b) the selection procedures it utilizes to make such decisions, and

(c) the decisions about which persons will receive job offers.

Accordingly, the various departments have developed different qualifications and different selection procedures. Furthermore, the different departments have made different decisions about who will be responsible for making screening and selection decisions.

*C. Autonomy in Determining Qualifications Sought*

UPRR's primary witness concerning UPRR's non-agreement selections procedures was Behrendt. Behrendt testified that at UPRR, for non-agreement selections, that the individual departments have the responsibilities for deciding what education, experience, or other qualifications would be sought from candidates for non-agreement jobs. He also stated that UPRR does not have a centralized way of establishing minimal qualifications, because it is decentralized and given to the departments to determine.

According to Behrendt, the individual hiring manager or interview panel is responsible for determining the content of the CNET job posting, which specifies the qualifications for each job. In fact, the written CNET Guidelines state that "[t]he hiring department builds a job posting in CNET using information from the Job Profile. The posting contains ... essential requirements,

basic purpose, primary accountabilities, desired experience, training, skills or education, and travel requirements." *See* DX R2 and PX 12-17.

Behrendt's testimony with respect to the departments' independence in specifying their own job qualifications was amply confirmed by the other witnesses at the hearing. Jan Ponciroli ("Ponciroli") and Rick Turner ("Turner") testified that the NCSC has established its own CNET Committee, which establishes the qualifications and criteria for NCSC positions, and the NCSC supplies all the information used for NCSC job postings. Richard Castagna ("Castagna") and Joseph Bearden ("Bearden") testified that they established additional non-standard qualifications requirements for the Manager of Yard Operations and Manager of Terminal Operations positions on the St. Louis Service Unit during a time when it was critical to address severe safety problems in that area. Clyde Dumstorff ("Dumstorff"), Ken Huels ("Huels"), and Ladonna Christ ("Christ") all testified that they as hiring managers established the qualifications for various jobs in the Information Technologies Department. The affidavits of the UPRR managers and the depositions excerpts, that the plaintiffs introduced as exhibits at the hearing, also confirm that each department establishes the qualifications required for its own positions. There was no contrary evidence on this point; rather the evidence shows that the departments at UPRR have the autonomy to establish their own qualifications and requirements for the jobs in their respective departments.

### D. Autonomy in Choosing Procedures to Assess Candidates' Qualifications

Behrendt testified that the individual departments are responsible for deciding what method will be used to assess the qualifications of candidates for non-agreement jobs, and that there is no common method of recruitment because it depends on the department. Behrendt's testimony was corroborated by the testimony of other witnesses at the hearing. Ponciroli and

Turner testified that the NCSC had decided to delegate authority to its NCSC Committee to decide what procedures would be used in screening and selecting candidates for NCSC positions. Castagna, Dumstorff, Huels, and Christ likewise testified about the procedures that they individually chose, as hiring managers, to follow in deciding who to select for non-agreement positions. This was confirmed by the affidavits of the UPRR managers introduced by the plaintiffs, and the deposition designations introduced by the plaintiffs. In fact, there was no evidence to the contrary.

### E. Autonomy in Screening Candidates and Extending Job Offers

Behrendt testified that the individual department, specifically the hiring manager for that job, makes the decisions about who will be chosen for non-agreement jobs and the "candidate selected is totally up to the department and is based upon the selection process they use to fill the position." He also testified that there is no "centralized supervision" of the non-agreement selection process at UPRR and that the HR Department plays only a "consultative" or "advisory" role in the non-agreement selection process. Behrendt testified that some departments chose to have the HR Department personnel participate in panels or on interview teams, others have HR managers assist with formulating interview questions, and other departments chose to have little or no HR Department assistance in the non-agreement selection process altogether. Behrendt's testimony that departments are responsible for their own selection decisions was corroborated by Ponciroli and Turner and the affidavit exhibits.

Plaintiff Grady, on the other hand, testified that the "general process" at UPRR was that the HR Department screens all applications for qualifications before they are sent to the individual departments and that this process was the same in every department. However, on cross-examination, Grady conceded that he had never actually been involved in making selections for

non-agreement vacancies and that the only basis for his purported knowledge was that unnamed "management" in his own department allegedly told him this. Grady's testimony is against the weight of the overwhelming evidence that shows that the HR Department does not have a standard screening approach that extends across the entire company.

## III. *The Named Plaintiffs*

Each of the four plaintiffs that bring the instant motion alleges that they have been discriminated against by UPRR. The plaintiffs have fought vigorously, and have argued strongly, that this Court should not look to the "merits" in this case.[5] However, this Court must look at some of the relevant facts in this case in order to do a proper Rule 23 analysis. *See, e.g.*, "[the Court must determine whether] there are questions of law or *fact* common to the class..." Fed.R.Civ.P. 23(a)(2) (emphasis added). Therefore, each of the plaintiffs, must be considered as a potentially appropriate class representative.

### A. *Karen Yapp's Claims*

Yapp filed a charge of discrimination with the EEOC on May 14, 2001, alleging mainly discrimination in promotions. The parties agree that the relevant time period under Title VII for Yapp begins on July 18, 2000, three hundred days before she filed her EEOC charge. Yapp identified, in her direct testimony, a list of the jobs she asserts that she has applied for during her

---

[5]In fact, whenever the slightest fact came up in the evidentiary hearing, the plaintiffs typically objected on the grounds that the evidence "went to the merits." While this Court certainly agrees that the instant task is not to determine what, if any, type of claims brought by the plaintiffs are meritorious in their own right, the plaintiffs must understand that some factual backdrop is necessary in order to make a proper and appropriate analysis pursuant to Rule 23. In other words, without looking at all at each of the plaintiff's respective situations or at the scope of the class that they seek to represent, this Court could not possibly determine whether there is commonality or typicality between the named plaintiffs and any putative plaintiffs. If this Court were to follow plaintiffs' approach regarding not looking at the "merits," this Court would not look at any facts and be left with having to decide the instant motion on feelings and hunches, which is something that this Court simply will not do.

employment by UPRR.[6]  Yapp testified that she believes that both race and sex discrimination were the cause of the alleged discrimination against her, and Yapp is seeking monetary damages for emotional harm.[7]

During her testimony, Yapp identified two applications that she submitted between July 18, 2000 (the beginning of the limitations period) and May 14, 2001, (the date of her EEOC charge) both for Project Engineer positions in the Information Technologies (IT) Department. Yapp offered no testimony whatsoever explaining why she believed that she had been discriminated against with respect to these two applications or about how subjective considerations allegedly entered into UPRR's decision making process with regard to these promotions.

Yapp applied for the first of the two Project Engineer vacancies in August of 2000, an analyst position in the Operations Support Group ("OSG") section of the IT Department (which is essentially the position that she holds today).  Yapp was selected for an interview for this position and was interviewed by a two-person panel consisting of Christ and Engus Carter ("Carter").[8]  Christ and Carter did not select Yapp for the position, and they told her that she was not selected because she did not have any "distributed computing" experience.  Yapp does not dispute that she did not have any "distributed computing" experience as of the time of her August 2000 (and January 2001) applications.

---

[6]Twenty-five of the applications on PX 36 identified by Yapp were submitted before July 18, 2000.  Yapp agreed that she is not seeking any relief in this lawsuit in regard to these applications.  In addition, four of the applications on PX 36 identified by Yapp were submitted during 2004, well after Yapp's filing of her EEOC charge on May 14, 2001.  No EEOC charge has been filed with respect to these applications.

[7]Title VII does not permit compensatory or punitive damages in a suit based solely on allegations of disparate impact.  *See* 42 U.S.C. § 1981(a)(1).

[8]Engus Carter is African-American.

Yapp applied for the second of the Project Engineer positions in January 2001. This time she did not receive an interview. Dumstorff, who was responsible for UPRR's distributed computing operations, told Yapp that she was not interviewed because she lacked distributed computing experience and because two of the positions had gone to individuals who had been working in the area on loan.

In regard to both applications at issue, as submitted by Yapp, Yapp presented no evidence at all that subjective considerations played any role in the non-selection of her for those positions. Plaintiffs merely pointed out that Christ on an August 2000 form stated that Yapp was not a "team player." Plaintiffs attempted to show that such a comment was false or pretextual, but Christ testified that her conclusion that Yapp was not a team player was based solely on the fact that Yapp had stated during her interview that she did not like to volunteer to work "comp time" on nights and weekends, which was a requirement of the position. In any case, Yapp does not dispute that she lacked the necessary distributed computing experience required of the position.

This Court finds that with respect to Yapp, and the vacancies for which she applied, plaintiffs presented no evidence at all that subjective considerations played any role in the non-selection of Yapp for those positions. Plaintiffs merely showed evidence that Yapp applied for and was not selected for the positions. UPRR showed evidence that Yapp was not qualified for the positions in which she was not hired.

*B. Mollie Jones' Claims*

Like Yapp, Jones filed a charge of discrimination with the EEOC on May 14, 2001, alleging, *inter alia*, discrimination in promotions. Jones alleges both race and sex discrimination. Jones identified two jobs, the same two jobs about which Yapp complains, the August 2000 and January 2001 Project Engineer vacancies in the OSG section of the IT Department. Like Yapp,

Jones also did not explain during her direct examination why she believed that she had been discriminated against with respect to these positions or about how subjective considerations allegedly entered into UPRR's decision making concerning these promotions. Again like Yapp, Jones did not have any experience in distributed computing.

In regard to the August 2000 vacancy, Jones was interviewed by Christ and Carter and was told that she was not selected because she did not have distributed computing experience. In regard to the January 2001 vacancies, she was told by Dumstorff that the people who were selected had the distributed computing experience which she lacked.[9] Unlike Yapp, however, Jones voluntarily resigned in May of 2001. Obviously, she was not able to complete the on the job training in distributed computing that was offered to her.

Plaintiffs pointed to some comments made by Christ and Carter in which they stated that Jones did not seem too motivated, and had poor body language, did not want to take any additional classes, and was hard to understand. Plaintiffs argued that these comments were inconsistent with a reference letter on Jones' behalf that stated that Jones was impressive and motivated. However, in any case, the evidence was undisputed that Jones lacked the necessary distributed computing experience.

This Court finds that plaintiffs presented no evidence whatsoever that subjective considerations played any role in the non-selection of Jones for the positions. Rather, UPRR showed that Jones (like Yapp) was not selected because she lacked a basic objective qualification for the positions.

*C. Rodney Grady's Claims*

---

[9]Finally, just like Yapp, Dumstorff arranged for Jones to receive on the job training to provide her with experience in distributive computing.

Rodney Grady filed a charge of discrimination with the EEOC on May 14, 2001, alleging, *inter alia*, discrimination in promotions. The parties agree that the relevant time period under Title VII for Grady's claims begins on July 18, 2000, 300 days before he filed his EEOC charge. Although Grady identified a list of vacancies in his direct testimony that he has sought since 1996, the only ones for which Grady has potentially timely claims for which he has filed an EEOC charge are the three dated 2000 and 2001. (Grady did not supply a month or date for these vacancies, so some effort is needed to determine which of these claims is timely.)

Grady identified three vacancies that he alleges he sought during 2000 and 2001, two "OSS" Manager Positions in 2000 and an assignment to assume the "project" responsibility in the "OSS" Group in 2001. All three positions were in the "OSS" section of the IT Department.

Grady initially testified that he was certain that he applied for the "OSS" Manager position after July 18, 2000; however, evidence adduced at trial showed that he applied for the first vacancy no later than June 18, 2000, and that the position was filed on July 3, 2000. Grady identified a letter that he sent to Huels in connection with his application for the first position which was dated June 14, 2000, and Grady agreed that it had to have been sent before July 18, 2000.[10] Huels testified that CNET shows that Grady applied for the position on June 17, 2000. Thus, Grady applied for the position more than 300 days before he filed his EEOC charge which makes it outside of the relevant time period for purposes of the instant motion. Furthermore, evidence at trial showed that Grady never even applied for the second "OSS" Manager vacancy at all. Grady stated that since the two "OSS Manager Positions were posted on CNET at the same time, he assumed that he was applying for both of them, yet he applied only

---

[10]Grady also identified the CNET posting for the position in which applications would be accepted from May 18, 2000 until June 18, 2000.

once.  Huels identified a list of candidates who applied for the position, which showed that Grady did not apply.  To be sure, Grady as a non-applicant for the position was not selected for the job.

Finally, Grady raised claims of discrimination concerning an assignment to take on the "project" responsibility in the "OSS" group of the IT Department that was filled in March 2001.  According to Grady and Huels, the position had been held by Jill Carron, who was going on maternity leave, and it was not posted on CNET.  Grady learned about the opening and was interviewed for the position.  In Huels's affidavit, which was submitted by plaintiffs as an exhibit, Huels stated that he chose Denise Shrum because her qualifications were outstanding and he was very impressed with her proven accomplishments.  Huels also explained that the job was not posted on CNET because it was a temporary position.

Plaintiffs argued that the non-posting of the temporary position on CNET was a violation of company policy.  However, plaintiffs never explained in any way how the lack of posting on CNET harmed Grady, especially considering that he was interviewed for the position.  During his direct testimony, like Yapp and Jones, Grady did not explain why he believed he had been discriminated against with respect to these positions or about how subjective considerations allegedly caused him not to be selected.

Grady voluntarily resigned his employment with UPRR effective as of July 31, 2004.  He did so because UPRR moved the bulk of its operations from St. Louis, Missouri to Omaha, Nebraska.  Although Grady was offered an opportunity to relocate to Omaha, he declined this offer and chose to resign instead.

*D. Cynthia Byas' Claims*

Byas filed a charge of discrimination with the EEOC on June 20, 2001, which means that the relevant Title VII limitations period for her personal claims begins on August 24, 2000, 300

days before she filed her EEOC charge. During her direct testimony, Byas identified a list of non-agreement vacancies that she alleges that she has applied for since 1997. Byas' sixteen applications submitted before 2000 are barred under Title VII and cannot serve as the basis for any class representation.

Byas alleges that she applied for the positions for Manager of Yard Operations (MYO) and Manager of Train Operations (MTO) in February 2001, and she filed an EEOC charge as a result of not being selected for these positions. The MYO and MTO vacancies about which Byas complains were located on the St. Louis Service Unit which was then part of the Southern Region, Transportation. There were five vacancies in these positions which were filled by four Caucasian men and one African-American man. Like the other plaintiffs, Byas did nothing more than state that she applied for the positions and was not selected. Byas offered no testimony to explain why she believed she was discriminated against or how subjective considerations entered into the process. However, Byas did state on cross-examination that she was "better qualified" than those who were selected for the positions.

Byas expressly stated that she was better qualified than Paul Hinton, an African-American man who was selected for one of the MTO vacancies, and she conceded that she could not have been discriminated in that position based on her race. Plaintiffs, in fact, presented no evidence that Byas was better qualified than those who were chosen for the position. Indeed, Byas admitted during cross-examination that she did not know a whole lot about those who were chosen to fill the positions.

During the evidentiary hearing there was considerable testimony of safety concerns and two related employee fatalities on the St. Louis Service Unit. Bearden and Castagna testified that they concluded that they needed additional managers of Yard Operations and Managers of Train

Operations who were either already experienced in these positions or who had worked as switchmen, brakemen, conductors or engineers, in order to address the safety problem. Castagna and Bearden testified that Byas, who never held the position of MYO, MTO, or in Train or Engine Service, was not selected because she did not meet the experience requirement, and that all five of the men who were selected did meet the experience requirement. Therefore, UPRR showed that Byas did not get the positions because she lacked the necessary objective criteria. Plaintiffs presented no evidence that Byas was rejected as a result of subjective considerations.

*IV. Dr. Bradley's Statistical Analyses*

In addition to the four named plaintiffs, the plaintiffs presented their expert, Dr. Bradley ("Bradley"), who testified during the evidentiary hearing. He examined the employee information of UPRR from 1996 to 2002 which involved non-agreement jobs. Bradley stated that the posting of vacancies in non-agreement jobs represents a pool, and he made what was called a "multiple pool analysis." Bradley concluded that UPRR's selection procedure had an adverse impact on a group containing in excess of one hundred African-American employees. For example, Bradley would have anticipated that approximately three hundred and eighty African Americans would have been selected had race not been an issue, when in fact two hundred and fifty eight job vacancies went to African Americans. He felt that anything less than an 80% adverse impact ration was adverse.

On cross-examination, Bradley stated that his analysis included all of the railroad departments at UPRR, which is more than twenty. He assumed that there was sufficient similarity in each department as to hiring and promotion, and therefore, Bradley made no distinction between the various departments at UPRR. Bradley also indicated that it was difficult for him to determine whether to consider the statistical evidence across the entire company or on a

departmental basis. He indicated that he may not have used a valid scientific reason for selecting his underlying data. Furthermore, he agreed that his statistics did not involve the study of corporate personnel decision-making, and that his statistics did not go into the background as to why interviews are granted or as to why people are promoted.

Although Bradley suggested that more job vacancies should have gone to African-Americans, Bradley was unable to specify which employment practice may have caused the disparate impact. Bradley was also unable to state whether the basis for the decisions made at UPRR was subjective or objective. Finally, Bradley assumed that all persons analyzed had minimal qualifications, but he could not be certain of this. In fact, Bradley assumed that he did not have to address minimal qualifications in order to establish adverse impact.

### Discussion

Plaintiffs request certification of all African-Americans, who, from July 18, 2000, to the present, have been adversely impacted by one or more aspects of the Defendant's policies, practices and procedures related to selections for non-agreement job vacancies.

The court has wide discretion in determining whether to certify a class. Coley v. Clinton, 635 F.2d 1364, 1378 (8th Cir. 1980). Federal Rule of Civil Procedure 23(a) establishes four prerequisites to the maintenance of a class action: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. See, FED. R. CIV. P. 23(a). The person seeking to represent the class bears the burden of demonstrating that all four prerequisites are satisfied. Wakefield v. Monsanto Company, 120 F.R.D. 112, 115 (E.D.Mo. 1988).

In determining whether to certify a class, the question before the court "is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but whether the requirements of Rule 23 are met." Wakefield, 120 F.R.D. at 115 (*quoting* Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). In a Rule 23 determination, the court accepts substantive allegations in the plaintiff's complaint as true. Mathers v. North Shore Mining Co., 217 F.R.D. 474, 483 (D.Minn. 2003). However, because "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action,' ... sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." General Telephone Co. v. Falcon, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (citations omitted).

Title VII contains no special provisions relieving the plaintiffs of the burden of satisfying the Rule 23 prerequisites. *See* Falcon, 457 U.S. at 156; Morgan v. United Parcel Service of America, 169 F.R.D. 349, 354 (E.D.Mo. 1996). A Title VII class action, like any other class action, may only be certified if the prerequisites of Rule 23(a) have been satisfied. Falcon, 457 U.S. at 161; Roby v. St. Louis Southwestern Railway Co., 775 F.2d 959, 961 (8th Cir. 1985).

*I. Numerosity*

Plaintiffs aver that the proposed putative class has over 1,000 members for the period from July 18, 2000, to the present, and that the class is geographically dispersed over 23 states. A class may not be certified unless the proposed class is so large that joinder of all class members would be impracticable. FED. R. CIV. P. 23(a). "No arbitrary rules regarding the necessary size of classes have been established." Paxton v. Union National Bank, 688 F.2d 552, 559 (8th Cir. 1982). A plaintiff must demonstrate that numerosity exists. Belles v. Schweiker, 720 F.2d 509,

515 (8th Cir. 1983). *See also*, <u>Tate v. Weyerhaeuser Co.</u>, 723 F.2d 598 (8th Cir. 1983), *cert. denied*, 469 U.S. 847, 105 S.Ct. 160, 83 L.Ed.2d 97 (1984).

None of the named plaintiffs, Yapp, Jones, Grady, or Byas, offered any testimony during the evidentiary hearing to suggest that other individuals might have been harmed by UPRR's policies, practices or procedures. Bradley was the only witness that testified that others could have been adversely impacted by UPRR, but Bradley did not identify the number of African-American applicants specifically affected by the subjective elements of UPRR's non-agreement selection process. However, Bradley did state that 380 African Americans should have been selected for job vacancies when instead only 258 had been selected. Yet, in his study, Bradley made no distinction between departments, did not conduct a thorough inquiry into minimal qualifications, did not account for corporate personnel decision-making, and ultimately conceded that he may not have used a valid scientific reason for selecting his underlying data. Most significantly, Bradley concluded that even though more African-Americans should have been hired for vacancies, he could not explain why they were not indeed hired for such vacancies. In other words, he could not point to the policy, practice, or procedure or to any reason at all for that matter, to explain this occurrence.

Because the plaintiffs have not explained to this Court how many African-Americans have not been selected for vacancies due to a policy, practice, or procedure at UPRR, this Court cannot determine the size of the putative class. Plaintiffs have speculated that it contains over one thousand people, but this Court has not been told by the plaintiffs what is causing the alleged discriminatory impact, which coupled with the fact that decision making at UPRR utilizes both subjective and objective criteria and is diverse and autonomous by department, makes the size of the putative class simply unknowable. Thus, the plaintiffs have not met their burden in

establishing numerosity pursuant to the requirement of Rule 23 based on their Title VII disparate impact theory. *See* FED. R. CIV. P. 23(a). As such, no further Rule 23 analysis is necessary since all four prerequisites must be met. However, this Court will analyze the commonality and typicality prerequisites as well, which the Court believes are also lacking in this case.

*II. Commonality*

Commonality and typicality are required to "bridge the gap" between an individual action and one brought on behalf of a group:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For respondent to bridge that gap, he must prove much more than the validity of his own claim. Falcon, 457 U.S. at 157-158.

The analysis of commonality and typicality often requires a discussion of overlapping facts. Clayborne v. Omaha Public Power District, 211 F.R.D. 573, 590 (D. Neb. 2002). In Falcon, the Supreme Court stated:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interest of the class members will be fairly and adequately protected in their absence. Falcon, 457 U.S. at 158 n. 13.

The commonality requirement may be met if a common issue pervades the class members' claims. Paxton, 688 F.2d at 561. Factors relevant to commonality include: (1) the nature of the employment practices charged; (2) the uniformity or diversity of the employer's employment practices; (3) the uniformity or diversity of the class membership; and (4) the nature of the employer's management organization. Clayborne, 211 F.R.D. at 590; Wakefield, 120 F.R.D. at

116; *See also*, <u>Stastny v. Southern Bell Tel. & Tel. Co.</u>, 628 F.2d 267, 277 (4th Cir. 1980); *and*,

<u>Harriss v. Pan American World Airways</u>, 74 F.R.D. 24, 41 (N.D.Cal. 1977).

In this case, the plaintiffs allege disparate impact. Plaintiffs have explained that they have applied for jobs, and did not receive them because of their race (and/or sometimes their gender). UPRR has argued that the plaintiffs did not receive the jobs because they either did not have the necessary distributive computing skills, someone with more experience received the jobs, or the plaintiff did not even apply for the job at issue.

Despite arguing that plaintiffs have suffered from disparate impact, plaintiffs have never pointed to the process, procedure or aspect of UPRR's decision-making process that is causing the alleged discriminatory impact. The parties rely on <u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 108 S.Ct. 2777, in which the court discussed the plaintiff's burden as follows:

> First, we note that the plaintiff's burden in establishing a *prima facie* case goes beyond the need to show that there are statistical disparities in an employer's workforce. The plaintiff must begin by identifying the specific employment practice that is challenged. Although this has been relatively easy to do in challenges to standardized tests, it may sometimes be more difficult when subjective selection criteria are at issue. Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities. <u>Id</u>. at 994, 995.

Thus, the Court is left wondering what process or procedure at UPRR is causing the alleged discriminatory impact, which also means that the Court has to wonder if that process or aspect is common to those who have attempted to obtain employment in the more than twenty different departments at UPRR that the plaintiffs seek to represent. Moreover, the four plaintiffs that bring the instant motion have offered testimony from their respective experiences from a total of only two departments, the IT Department and the Transportation Region.

It is impossible for this Court to find common legal or factual issues between the named plaintiffs and any putative plaintiffs when the named plaintiffs have not told this Court what process or procedure caused them to suffer disparate impact, especially considering that the many departments utilize different methods for selecting job candidates that encompass both objective and subjective criteria. Therefore, the Court concludes that as plaintiffs have not identified the practice or procedure that is causing disparate impact in an organization with mixed objective and subjective hiring methods and discretion left to hiring managers, there can be no finding of commonality in this case warranting class certification.

*III. Typicality*

Typicality requires "a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." Donaldson v. Pillsbury Co., 554 F.2d 825, 830 (8th Cir. 1977); *See* Chaffin v. Rheem Manufacturing Co., 904 F.2d 1269, 1275 (8th Cir. 1990); *See also*, Paxton, 688 F.2d at 562. Factors relevant to the typicality requirement include: (1) plaintiffs' employment situation and that of the prospective class members; (2) the circumstances surrounding plaintiffs' grievances and those surrounding the prospective class members' grievances; and (3) the relief sought by plaintiff and that sought by the class. Clayborne, 211 F.R.D. at 591; Wakefield, 120 F.R.D. at 116; Harriss, 74 F.R.D. at 42.

Usually, under a disparate impact theory, the plaintiffs will point to a facially neutral policy or practice which the plaintiffs contend to prove has a disparate impact on the protected group of employees. Here, however, plaintiffs have not pointed out any actual policy, rather they just generally point to UPRR's subjective decision making process.

In certain situations, subjective employment practices may give rise to a claim of discrimination. Falcon, 457 U.S. at 159, n. 15. Of course, class certification is not appropriate if

the challenged policy or practice does not have a disparate impact on the proposed class. *See* Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292 (2nd Cir. 1999).

This Court concludes that the plaintiffs fail the typicality requirement. It cannot be assumed in this case that whatever is causing the alleged disparate impact, is similar or typical to whatever could be allegedly causing disparate impact to others at UPRR, especially in light of the tremendous variation across departments at UPRR in the qualifications each department utilizes for selections, the selection procedures used to make decisions, and the decisions about which persons will receive job offers. Furthermore, during the evidentiary hearing none of the plaintiffs presented any evidence that subjective considerations played any role in their non-selection, and in the same hearing UPRR presented evidence that objective considerations played a role in each plaintiff's non-selection. Therefore, although a disparate impact claim can be based on entirely subjective employment practices, where there are objective factors, even a generally subjective process will not satisfy Rule 23(a)'s commonality and typicality requirements. *See* Betts v. Substrand Corp., 1999 WL 436579 at *6 (N.D.Ill. June 21, 1999) ("The facts show the company followed different hiring practices for different types of positions. Such a wide range of jobs does not indicate a commonality of facts."); Appleton v. Deloitte & Touche, L.L.P., 168 F.R.D. 221, 228 (M.D. Tenn. 1996).

*IV. Adequacy of Representation*

The issue of adequacy is met when "the representative parties will fairly and adequately protect the interest of the class." FED.R.CIV.P. 23. Determining adequacy of representation involves a two-fold inquiry to determine whether: (1) the class representatives have common interests with members of the class, and (2) whether the class representatives will vigorously

prosecute the interests of the class through qualified counsel.  <u>Wakefield</u>, 120 F.R.D. at 117 *citing*

<u>Paxton</u>, 688 F.2d at 562.

The issue of adequacy of representation is lacking in this case because of the lacking numerosity requirement, and because of the lacking commonality and typicality requirements.  In other words, if there are no other putative plaintiffs, whether the named plaintiffs would adequately protect the nonexistent other putative plaintiffs is a *non sequitur*.  Furthermore, without commonality or typicality, these plaintiffs cannot adequately represent others with different issues of law and fact among them.[11]  Finally, there is no doubt that plaintiffs' counsel have adequate experience to maintain a class action; however, without evidence to suggest that the plaintiffs would possess the same interests and have suffered the same injures as other potential class members, there can be no adequacy of representation regardless of counsel's experience.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Class Certification (#41) be and hereby is **DENIED**.

Dated this  5th  day of August, 2005.

_____

SENIOR UNITED STATES DISTRICT JUDGE

---

[11]In addition, two of the four named plaintiffs, Jones and Grady, no longer work at UPRR because they voluntarily resigned.  Although the issue is not dispositive in this case, it is highly questionable whether former employees could adequately represent current employees in a case such as this one (assuming first that all other prerequisites were met).  *See e.g.*, <u>Lang v. Kansas City Power & Light Co.</u>, 199 F.R.D. 640, 656 (W.D. Mo. 2001).